IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| RONALD E. KLEIN, | ) | |
| --- | --- | --- |
| | ) | |
| Plaintiff, | ) | Civil Action No. 13-1497 |
| | ) | |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

**I. Introduction**

Plaintiff, Ronald E. Klein ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act (the "Act"), seeking judicial review of the final decision of the Commissioner of Social Security ("Defendant" or "Commissioner") denying his application for supplemental security income ("SSI").[1] The parties have submitted Cross–Motions for Summary Judgment on the record developed at the administrative proceedings. For the following reasons, Plaintiff's Motion for Summary Judgment (ECF No. 11) will be DENIED. The Commissioner's Motion for Summary Judgment (ECF No. 13) will be GRANTED and the administrative decision of the Commissioner will be AFFIRMED.

**II. Procedural History**

On March 22, 2011, Plaintiff filed an application for SSI, alleging disability beginning November 1, 2004, due to a back injury, depression, a foot injury, and wrist problem. (R. at 139-

---

[1] Plaintiff filed a prior application for SSI in July 2006 which was denied initially. (R. at 12). Plaintiff requested a hearing, and on September 8, 2008 a different administrative law judge dismissed his claim for failing to appear at the hearing. (R. at 59-60). The ALJ in this case found no reason to reopen or revise this prior determination. (R. at 12).

145, 188).[2]  The claim was initially denied on May 31, 2011.  (R. at 74).  On June 15, 2011, Plaintiff filed a written request for hearing pursuant to 20 C.F.R. § 416.1429, *et. seq.*  (R. at 84-86).  An administrative hearing was held on August 13, 2012, in Mars, Pennsylvania, before Administrative Law Judge ("ALJ") John J. Porter.  (R. at 25-56).  Plaintiff, who was represented by counsel, appeared and testified.  (R. at 27-48).  Ms. Kinley, an impartial vocational expert ("VE"), also testified.  (R. at 48-55).  In a decision dated September 27, 2012, the ALJ determined that Plaintiff was not disabled within the meaning of the Act.  (R. at 12-21).  The Appeals Council denied Plaintiff's request for review on September 25, 2013 (R. at 1-6), thereby rendering the ALJ's decision the final decision of the Commissioner in this case.

Plaintiff commenced the present action on October 16, 2013 seeking judicial review of the Commissioner's decision.  (ECF No. 3).  Plaintiff filed a Motion for Summary Judgment on February 22, 2014.  (ECF No. 11).  Defendant filed a Motion for Summary Judgment on March 17, 2014.  (ECF No. 13).  These motions are the subject of this Memorandum Opinion.

### III. Statement of the Case

#### A. The ALJ's decision

In his decision denying SSI to Plaintiff, the ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since March 22, 2011, the application date (20 C.F.R. § 416.971 *et seq*.).  (R. at 14).

2. The claimant has the following severe impairments: history of low back pain, fibromyositis, alcoholism, and a schizoaffective disorder 20 C.F.R. § 416.920(c)).  (R. at 14).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR

---

[2] References to the administrative record (ECF No. 9), will be designated by the citation "(R. at __)".

Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925 and 416.926). (R.at 14).

4. After careful consideration of the entire record, the ALJ found that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. § 416.967(b) except he must be afforded a sit/stand option and the ability to change positions at a maximum frequency of 30 minutes; was limited to simple, routine, repetitive tasks not involving fast pace or more than simple work decisions; and could have only incidental collaboration with coworkers and the public and collaboration with the supervisor for about 1/6 of the time. (R. at 16).

5. The claimant was unable to perform any past relevant work (20 C.F.R. § 416.965). (R. at 19).

6. The claimant was born on April 1, 1959, and was 51 years old, which is defined as an individual closely approaching advanced age, on the date the application was filed (20 C.F.R. § 416.963). (R. at 19).

7. The claimant has a limited education and is able to communicate in English (20 C.F.R. § 416.968). (R. at 19).

8. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and (20 C.F.R. Part 404, Subpart P, Appendix 2). (R. at 19).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national

economy that the claimant can perform (20 C.F.R. §§ 416.969 and 416.969(a)).

(R. at 19).

10. The claimant has not been under a disability, as defined in the Social Security Act, since April 20, 2010, the date the application was filed (20 C.F.R. § 416.920(g)). (R. at 20).

**B. Medical evidence**

On May 10, 2011, Plaintiff underwent a consultative physical examination performed by Daniel G. Christo, D.O. (R. at 261-264). Plaintiff reported that he broke his wrist one year prior after falling down at work. (R. at 261). He further reported that he had "bad knees," a bulging disc in his back, and memory problems. (R. at 261). He indicated that he had attended alcohol rehabilitation in 2002, but stated that he only drank occasionally. (R. at 261). Plaintiff stated that he last worked as a contractor in 2001 and currently performed "little jobs on the side." (R. at 262). Dr. Christo reported that Plaintiff was alert and fully oriented, could easily recall his medical history, could recall three words throughout the evaluation without difficulty, add simple and complicated numbers, and perform serial seven's normally. (R. at 263). Plaintiff's physical examination was unremarkable. Dr. Christo found that Plaintiff had a full range of motion in his back, with no tenderness found. (R. at 263). Forward and backward flexion, side bending, and rotation were all normal, and Plaintiff was able to alternate between sitting and supine positions without any difficulty. (R. at 263). Dr. Christo further found that Plaintiff had a full range of motion of his hips, knees, and ankles, and his strength was 5/5. (R. at 263). Some crepitance was noted in Plaintiff's left knee, but there was no swelling or effusion. (R. at 263). Plaintiff also had a full range of motion of his shoulders, elbows, wrists, and fingers, no finger deformities

were observed, and his grip strength was normal. (R. at 263). Plaintiff's gait and heel to toe walk ability were normal. (R. at 263).

Dr. Christo assessed Plaintiff with a history of low back pain with no accompanying data and no evidence of radiculopathy, nerve entrapment, or significant clinical findings; history of fractured ribs with good function on clinical examination and no accompanying data; borderline hypertension; ethanol abuse; and vague history of memory issues with no accompanying data and unremarkable cognitive neurocognitive exam. (R. at 264). Dr. Christo assessed Plaintiff's ability to perform work-related physical activities, opining that Plaintiff could frequently lift and carry up to 25 pounds; stand, walk, and sit without limitation; had no limitations in his pushing and pulling abilities; could frequently perform postural activities; and had no environmental restrictions. (R. at 255).

Clinical psychologist T. David Newman, Ph.D., performed a psychological evaluation of Plaintiff on May 20, 2011. (R. at 269-273). Plaintiff claimed an inability to work due to "a bad back, bad shoulders, tendinitis, my knees…and I have short-term memory problems." (R. at 269) (alteration in original). Dr. Newman noted that Plaintiff had no history of psychiatric inpatient hospitalization, was not seeing a therapist or psychiatrist, and was not taking medication. (R. at 269). Plaintiff reported a history of alcohol abuse but stated that he only drank occasionally. (R. at 269). He further reported a history of incarceration for burglary in the 1980's and breaking and entering in 2001 for three years. (R. at 270). Plaintiff indicated that he currently performed odd jobs such as cutting grass and lived with his girlfriend. (R. at 270). He cooked, performed household chores, went to stores, drove, and passed his time by doing word puzzles, reading, and taking walks. (R. at 270).

5

On mental status examination, Dr. Newman reported that Plaintiff exhibited appropriate hygiene and grooming, a good degree of eye contact, a calm demeanor, was not anxious, was alert and appropriately responsive to questions. (R. at 270). Plaintiff's speech was clearly articulated, and content was consistently relevant, rational and coherent. (R. at 270). Dr. Newman had no difficulty establishing a working rapport with Plaintiff. (R. at 270). He found Plaintiff displayed a good range of affective expression with sufficient depth and at no time was he inappropriate, and his mood was normal. (R. at 270). Plaintiff denied having any suicidal thoughts or a history of perceptual disturbances, and his thought content, abstract thinking, and concept formation were intact. (R. at 270). Dr. Newman found Plaintiff's fund of general information was only mildly limited, with no substantial disturbance of concentration ability. (R. at 270). He had reasonably intact memory processes, no recall difficulties, no impulse control disturbance, sufficient social and test judgment, and good insight. (R. at 270-271). Dr. Newman found no mental health condition, and reported that Plaintiff's examination was "entirely unremarkable" and that his complaints were primarily somatic. (R. at 271). He observed no problems with Plaintiff's station and gait, and opined that he could manage personal funds in a competent manner independently. (R. at 271). Dr. Newman imposed no work-related imitations. (R. at 271).

On May 25, 2011, Nghia Van Tran, M.D., a state agency reviewing physician, reviewed the medical evidence of record and concluded that Plaintiff could lift and/or carry 50 pounds occasionally and 25 pounds frequently; stand/walk/sit for about six hours in an 8-hour workday; was unlimited in his ability to push and/or pull consistent with his lifting and carrying abilities; and had no postural or other limitations. (R. at 68).

On May 26, 2011, Emanuel Schnepp, Ph.D., a state agency reviewing psychologist, reviewed the psychiatric evidence of record and opined that Plaintiff was mildly limited in his activities of daily living and ability to maintain social functioning, moderately limited in his ability to maintain concentration, persistence or pace, and had no episodes of decompensation of an extended duration. (R. at 66). He found that Plaintiff was either "not significantly limited" or only "moderately limited" with respect to his ability to perform sustained work activities. (R. at 69-70). He opined that Plaintiff could understand, retain, and follow simple instructions, in a routine, repetitive work environment; was able to maintain socially appropriate behavior; and could adapt to changes and exercise appropriate judgment in the workplace. (R. at 70-71). He observed that Plaintiff was not receiving any mental health services or taking any psychiatric medication. (R. at 66). Dr. Schnepp concluded that Plaintiff was capable of performing the basic mental demands of competitive work on a sustained basis. (R. at 66).

Plaintiff was seen by Ron Garbutt, M.D. from the Staunton Clinic on June 1, 2012. (R. at 277-282). Plaintiff reported a history of mood swings, anxiety, alcohol abuse, and paranoia. (R. at 277). Plaintiff claimed he sometimes heard voices and talked to himself. (R. at 277). He indicated that he previously took psychiatric medications while in rehabilitation or while incarcerated, but was not currently taking any medication. (R. at 277-278). On mental status examination, Plaintiff exhibited an appropriate appearance, a cooperative attitude, restless psychomotor activity, a fast rate and normal volume of speech, a dysphoric mood, a labile range of affect, a linear and goal-directed thought process, no suicidal or homicidal ideations, normal impulse control, paranoid delusions, auditory hallucinations, and fair insight and judgment. (R. at 280). Dr. Garbutt assessed Plaintiff with schizoaffective disorder-bipolar and alcohol abuse, and assigned him a current Global Assessment of Functioning ("GAF") score of 45 and a highest

7

past year GAF score of 50.[3] (R. at 281). Plaintiff was given samples of Seroquel and instructed to return in three weeks. (R. at 282).

Plaintiff returned to Dr. Garbutt on June 21, 2012 and reported that he was tolerating his medication. (R. at 283). Plaintiff indicated that he still talked to himself but denied hearing voices, and denied having any suicidal or homicidal thoughts. (R. at 283). On mental status examination, Dr. Garbutt found Plaintiff exhibited appropriate appearance, his psychomotor activity, rate and volume of speech, mood, range of affect, and impulse control were all normal, he had no delusions or hallucinations, and his insight was good. (R. at 283). Dr. Garbutt adjusted Plaintiff's medications, and he was to return in four weeks. (R. at 283).

Plaintiff was seen by Richard G. Cassoff, M.D. on August 2, 2012. (R. at 284). Plaintiff complained the he "ache[d] all over." (R. at 284). Plaintiff reported that he last worked construction two years prior, and claimed an inability to work because of diffuse aches and pains. (R. at 284). Plaintiff brought a medical source statement to be completed and returned to his attorney. (R. at 284). On physical examination, Plaintiff's head, nose, throat, thyroid, lungs, heart, and abdomen were unremarkable, he exhibited 2+ pulses and no edema or calf tenderness, and he was neurologically intact. (R. at 284). Dr. Cassoff assessed him with "[h]istory most consistent with fibromyositis," referred him to Dr. Turkay, indicated he would complete the disability form, and ordered laboratory studies. (R. at 284).

---

[3]The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 41 to 50 may have "[s]erious symptoms (e.g., suicidal ideation ....)" or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.*

When seen by Dr. Cassoff on August 16, 2012, Plaintiff had no new complaints. (R. at 285). Dr. Cassoff noted that an additional purpose of the office visit was to complete the medical source statement. (R. at 285). Plaintiff stated that in the past he had been told he had high blood pressure and prescribed medication. (R. at 285). Dr. Cassoff assessed Plaintiff with high blood pressure and provided him with samples of blood pressure medication. (R. at 285).

Dr. Cassoff completed a form entitled "Medical Source Statement Concerning the Nature and Severity of an Individual's Physical Impairment." (R. at 286-293). Dr. Cassoff opined that since 2010, Plaintiff was incapable of performing light work even if afforded a sit/stand option. (R. at 287-288). He found that Plaintiff was severely limited in his ability to maintain attention and concentration for extended periods, and moderately severely limited in his ability to perform activities within a schedule, maintain regular attendance, complete a normal workday and workweek without interruptions from medically based symptoms, and perform at a consistent pace without an unreasonable number/length of rest periods. (R. at 289). Plaintiff could only sit/stand/walk for one hour before requiring a rest or an alternate position, and lift and carry up to five pounds. (R. at 289-290). Plaintiff's total eight hour capacity was thirty minutes with respect to reaching, handling, fingering, feeling, stooping, and forty five minutes with respect to crouching. (R. at 290-292). Finally, Dr. Cassoff opined that Plaintiff had limitations of movement with respect to his cervical and lumbosacral spines secondary to pain. (R. at 292).

On August 20, 2012, Dr. Garbutt completed a form entitled "Medical Source Statement Concerning the Nature and Severity of an Individual's Mental Impairment." (R. at 295-301). He indicated that Plaintiff's diagnoses was schizoaffective disorder-bipolar type and alcohol abuse, and his current GAF score was a 45, and the highest in the last year was a 50. (R. at 295). Dr. Garbutt assessed Plaintiff's mental limitations in numerous areas, including understanding and

9

memory, sustained concentration and persistence, social interaction, and adaption, and found that he was either moderately limited or markedly limited with respect to these areas. (R. at 297-299). As to the effect of work-related stressors, Dr. Garbutt noted that the following would increase Plaintiff's level of impairment: unruly, demanding or disagreeable customers even on an infrequent basis; production demands or quotas; a demand for precision; a need to make quick and accurate independent decisions on a consistent basis; and a need to make accurate independent decisions on a consistent basis. (R. at 299). He found Plaintiff had a "substantial loss" of his ability to understand, remember, and carry out simple instructions; make simple work-related judgments; respond appropriately to supervision, coworkers, and usual work situations; and deal with changes in a routine work setting. (R. at 300). Dr. Garbutt was of the view that Plaintiff's mental impairments or treatment would cause him to be absent from work more than three times per month. (R. at 297).

**C. Hearing testimony**

Plaintiff testified that since April 2011 he performed odd jobs "under-the-table" such as cutting grass, and had applied for jobs but was not hired. (R. at 32). Plaintiff testified that he suffered from pain and numbness in both hands and was unable to grip things. (R. at 33). He also stated that suffered from neck, knee and back pain, which limited his ability to stand, walk and sit. (R. at 34-35). He indicated that he needed to change positions every fifteen to twenty minutes. (R. at 35). Plaintiff stated he also had concentration difficulties, and became forgetful or confused, and had sleep difficulties. (R. at 37-38). He further stated that he had constant feelings of paranoia. (R. at 46). He indicated that he took Seroquel which caused fatigue, and took three to four one-hour naps daily. (R. at 42). Plaintiff testified that he currently lived alone, was able to cook, clean, and cut the grass but took breaks while doing so. (R. at 38-39).

10

The VE was asked to assume an individual of the same age, education and work experience as Plaintiff, who was able to perform light work but needed a sit/stand option with the ability to change positions at a maximum frequency of thirty minutes; simple, routine, repetitive tasks that were not fast paced; only simple work decisions; only incidental collaboration with the public and coworkers; and collaboration with a supervisor one-sixth of the time. (R. at 49). The VE testified to a significant number of jobs in the national economy that such an individual could perform, such as a parking lot attendant, night patroller, and packing line worker. (R. at 50). The VE further testified that if the hypothetical individual were limited to using his hands for fine fingering and grasping only 66 percent of the time, he could still perform the parking lot attendant and night patrol position. (R. at 50). Finally, the VE testified that all jobs would be eliminated if the hypothetical individual needed to nap frequently, suffered from walking difficulties, and had concentration difficulties. (R. at 51-54).

## IV. Standard of Review

This Court's review is limited to determining whether the Commissioner's decision is "supported by substantial evidence." 42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994). The Court may not undertake a *de novo* review of the Commissioner's decision or re-weigh the evidence of record. *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986). Congress has clearly expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) (internal quotation marks omitted). As long as the Commissioner's

decision is supported by substantial evidence, it cannot be set aside even if this Court "would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). "Overall, the substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents hi m [or her] from engaging in any 'substantial gainful activity' for a statutory twelve-month period." *Stunkard v. Secretary of Health & Human Services*, 841 F.2d 57, 59 (3d Cir. 1988); *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987); 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant is considered to be unable to engage in substantial gainful activity "only if his [or her] physical or mental impairment or impairments are of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2) (A), 1382c(a)(3)(B).

To support his or her ultimate findings, an administrative law judge must do more than simply state factual conclusions, he or she must make specific findings of fact. *Stewart v. Sec'y of Health, Educ. & Welfare*, 714 F.2d 287, 290 (3d Cir. 1983). The administrative law judge must consider all medical evidence contained in the record and provide adequate explanations for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its legislatively delegated rule making authority, has promulgated a five-step sequential evaluation process for the purpose

of determining whether a claimant is "disabled" within the meaning of the Act. The United States Supreme Court has summarized this process as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity." [20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-5, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003) (footnotes omitted).

In an action in which review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision. In *SEC v. Chenery Corp.*, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), the Supreme Court explained:

> When the case was first here, we emphasized a simple but fundamental rule of administrative law. That rule is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

*Chenery Corp.*, 332 U.S. at 196. The United States Court of Appeals for the Third Circuit has recognized the applicability of this rule in the Social Security disability context. *Fargnoli v. Massanari*, 247 F.3d 34, 44, n.7 (3d Cir. 2001). Thus, the Court's review is limited to the four corners of the ALJ's decision.

## V. Discussion

Plaintiff first claims that the ALJ's decision is "fatally flawed" since he failed to specifically address the medical source statement of his treating psychiatrist, Dr. Garbutt. (ECF No. 12 at pp. 7-8). This argument merits little discussion since it is unsupported by the record. In his decision, the ALJ specifically addressed this report, as well as his reasons for discrediting Dr. Garbutt's opinion, stating:

> I recognize that a caregiver at the Staunton Clinic completed a medical source statement in August 2012 essentially indicating that the claimant cannot perform work activity because of his mental impairments, and rated the claimant's GAF at 45 (Exhibit B8F). This report was prepared only about one or two months after the claimant began treatment at that clinic (Exhibit B8F). Furthermore, this report does not contain much in the way of objective findings and is clearly inconsistent with the claimant's appearance and demeanor at the hearing, the results of the consultative psychological evaluation conducted by Dr. Newman in May 2011 (Exhibit B7F), and the observations of Dr. Christo regarding the claimant's mental health status as of May 2011 (Exhibit B5F). Dr. Newman's narrative, in particular, is quite thorough and contains significant mental health findings, whereas the assessment from the caregiver at the Staunton Clinic appears to base his conclusions largely on the claimant's subjective assertions. In addition, the report from the Staunton Clinic does not account for significant alcohol abuse and therefore is incomplete.

(R. at 18). The fact that the ALJ did not refer to Dr. Garbutt by name does not render the discussion of this evidence inadequate.[4] Accordingly, we find no error in this regard.

Plaintiff next argues that the ALJ improperly disregarded the opinions of his treating physicians. As the United States Court of Appeals for the Third Circuit has stated "[a] cardinal

---

[4] Dr. Garbutt's reported is set forth in Exhibit B10F rather than Exhibit B8F as identified by the ALJ. However, it is clear given the context of the discussion set forth above that the ALJ was discussing Dr. Garbutt's report.

14

principle guiding disability determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a long period of time.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)) (citations omitted); *see also Adorno v. Shalala*, 40 F.3d 43, 47 (3d Cir. 1994). As such, "a court considering a claim for disability benefits must give greater weight to the findings of a treating physician than to the findings of a physician who has examined the claimant only once or not at all." *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993). A treating source's opinion concerning the nature and severity of the claimant's alleged impairments will be given controlling weight if the Commissioner finds that the treating source's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. *Fargnoli v. Massanari,* 247 F.3d 34, 43 (3d Cir. 2001); 20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2). However, physician opinions are not binding upon an ALJ, and an ALJ is free to reject a medical source's conclusions. *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2012). Where an ALJ chooses to reject the opinion of a treating physician, he must adequately explain in the record his reason for doing so. *See Sykes v. Apfel*, 228 F.3d 259, 266 (3d Cir. 2000) ("Where the Secretary is faced with conflicting evidence, he must adequately explain in the record his reasons for rejecting or discrediting competent evidence."). "In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981). Therefore, the ALJ may choose to reject a treating physician's opinion if it conflicts with other medical evidence and the ALJ explains his reasons for doing so.

As previously set forth above, the ALJ discredited Dr. Garbutt's opinion since it was rendered after only one or two office visits, and did not include much in the way of objective findings to support such extreme limitations. (R. at 18). The ALJ also found Dr. Garbutt's opinion was inconsistent with the other medical opinions of record, namely Dr. Newman and Dr. Christo. (R. at 18). The ALJ similarly assigned "little weight" the opinion of Dr. Cassoff, who found that Plaintiff was precluded from working on the basis of his physical impairments. (R. at 19, 287-289). In this regard, the ALJ reasoned:

> I note also that Dr. Cassoff completed a medical source statement in August 2012 essentially indicating that the claimant cannot perform even sedentary work because of his inability to lift and carry objects, and sit, stand, and walk for more than brief periods, and his belief that the claimant has severe impairment in concentration (Exhibit B9F). However, I also afford little weight to that report as it also appears based primarily on the claimant's subjective assertions. Furthermore, this assessment was also based on only one examination performed by the physician in August 2012 (Exhibit B9F). Aside from reported diminished range of motion in the cervical and lumbar regions (the degree of which was not specified), Dr. Cassoff's report indicates normal neurological functioning and basically no other specific clinical findings to support a conclusion of total disability.

(R. at 19).

The medical evidence supports the ALJ's determination that these opinions were contradicted by the treatment notes and the totality of the evidence. For example, with respect to his mental impairments, Plaintiff was seen by Dr. Garbutt on only two occasions for his alleged mental complaints, and although some abnormal findings were found on mental status examination at this first visit, Plaintiff was not undergoing treatment and was not on any medication. (R. at 277-278). At his second visit with Dr. Garbutt, Plaintiff's mental status examination revealed that his psychomotor activity, rate and volume of speech, mood, range of affect, and impulse control were all normal, he had no delusions or hallucinations, and his insight was good. (R. at 283).

16

Dr. Garbutt's opinion also conflicted with the opinion of Dr. Newman, the consultative psychologist, who performed a thorough psychological evaluation of the Plaintiff and found no significant mental health findings and concluded Plaintiff had no mental health diagnosis. (R. at 17-18, 270-271). As the ALJ observed, Dr. Newman found Plaintiff was able to drive, perform odd jobs, cook, perform chores, work puzzles, read and take walks, and had no limitations with respect to concentration, persistence and pace. (R. at 16, 270). Dr. Garbutt's opinion was further inconsistent with Dr. Christo's examination, who found that Plaintiff had no serious signs of impairment in his thought processes, memory or concentration. (R. at 16, 263).

Dr. Cassoff's opinion was equally unsupported by the evidence of record. Plaintiff was seen by Dr. Cassoff on two occasions, and, as noted by the ALJ, the objective findings on physical examination were minimal, with only some diminished range of motion in the cervical and lumbar areas noted. (R. at 17, 284-285). On the second visit, Plaintiff had no new complaints and no physical examination findings were reported. (R. at 285). Dr. Christo, the consultative physician who performed a physical examination of the Plaintiff, found that Plaintiff had full range of motion in both the cervical and lumbar spines, was able to sit, stand, and walk without difficulty, displayed good grip and full strength in his upper and lower extremities, and was neurologically intact. (R. at 263). Dr. Christo concluded that Plaintiff could perform light work. (R. at 254-255).

In sum, the ALJ conducted a thorough evaluation of the medical evidence in concluding that Dr. Garbutt and Dr. Cassoff's opinions were not entitled to controlling weight. (R. at 17-19). In making this determination, the ALJ provided sufficient and well-reasoned grounds, and his conclusions are supported by substantial evidence.

Plaintiff next challenges the ALJ's assessment of his residual functional capacity ("RFC"). "'Residual functional capacity is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999)); *see also* 20 C.F.R. §§ 404.1545(a); 416.945(a). An individual claimant's RFC is an administrative determination expressly reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e)(2); 416.927(e)(2). In making this determination, the ALJ must consider all the evidence before him. *Burnett*, 220 F.3d at 121. This evidence includes "medical records, observations made during formal medical examinations, descriptions of limitations by the claimant and others, and observations of the claimant's limitations by others." *Fargnoli v. Halter*, 247 F.3d 34, 41 (3d Cir. 2001). Moreover, the ALJ's RFC finding must "be accompanied by a clear and satisfactory explication of the basis on which it rests." *Id*. (quoting *Cotter*, 642 F.2d at 704).

With respect to the Plaintiff's physical impairments, he argues that the ALJ failed to include his inability to stand and walk six hours in an 8-hour workday, and failed to adequately address the impact of his hand numbness in assessing his RFC. (ECF No. 12 at p. 13). To the extent Plaintiff is relying on Dr. Cassoff's opinion in support of these claimed limitations, such reliance is unavailing. As discussed in connection with the ALJ's evaluation of the medical evidence, the ALJ appropriately discredited Dr. Cassoff's opinion as inconsistent with the medical evidence. Dr. Christo reported that Plaintiff was able to sit, stand, and walk without difficulty, and he had a full range of motion with his fingers and his grip strength was normal. (R. at 263). In addition, the ALJ noted that Plaintiff was able to move about on a regular basis without the use of an assistive device, and had not undergone any aggressive or conservative

18

treatment (such as physical therapy) for his various musculoskeletal concerns. (R. at 17). The ALJ accommodated the Plaintiff's alleged limitations with respect to sitting and standing by fashioning an RFC that allowed him to change positions. With respect to Plaintiff's claimed hand numbness, the VE testified that Plaintiff could still perform the parking lot attendant position, and could also work as an information clerk. (R. at 50).

We further find no error with respect to the ALJ's evaluation of the Plaintiff's mental impairments in fashioning his RFC. The ALJ found Plaintiff was limited to simple, routine, repetitive tasks not involving fast pace or more than simple work decisions, and could have only incidental collaboration with coworkers and the public and collaboration with the supervisor for about 1/6 of the time. (R. at 16). Plaintiff argues that the ALJ's RFC finding failed "to encapsulate all of the limitations flowing from [his] severe mental illness" and contends that his low GAF score of 45 demonstrates a complete inability to work. (ECF No. 12 pp. 13-14). The ALJ specifically rejected this GAF score assessed by Dr. Garbutt, however, as inconsistent with the remaining medical evidence. (R. at 18). An ALJ may properly reject a GAF score when it is inconsistent or unsupported by the record as a whole. *Torres v. Barnhart*, 139 F. App'x 411, 415 (3d Cir. 2005); *Blakey v. Astrue*, 2010 WL 2571352 at *11 (W.D.Pa. 2010).

Plaintiff finally challenges the ALJ's reliance on the VE's testimony that there were a number of jobs in the national economy that he could perform despite his limitations. (ECF No. 12 at pp. 13-15). Plaintiff contends that the ALJ failed to accurately account for his problems with hypertension, carpal tunnel syndrome/hand numbness, fatigue, and mental impairments. Testimony of a vocational expert concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the hypothetical question accurately portrays the claimant's impairments. *Podedworny v. Harris*, 745 F.2d 210,

19

218 (3d Cir.1984). With respect to Plaintiff's hypertension, the record is devoid of any limitations resulting from this alleged impairment. With respect to Plaintiff's alleged hand numbness, the VE testified that if he were limited to using his hands for fine fingering and grasping only 66 percent of the time, he could still perform the job of a parking lot attendant, and could also work as an information clerk. (R. at 50). To the extent that Plaintiff contends that the ALJ should have credited the VE's testimony that there were no jobs in the national economy he could perform if he needed to nap frequently and had problems with concentration, the ALJ is only required to accept such testimony if such limitation was supported by the record. *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir.1987). Here, the ALJ concluded that they were not (R. at 20), and for the reasons previously discussed, we find that Plaintiff's proposed limitations were not supported by substantial evidence.

## VI. Conclusion

Based upon the foregoing, the Court finds that substantial evidence supports the decision of the ALJ finding Plaintiff not disabled under the Act. Accordingly, Plaintiff's Motion for Summary Judgment (ECF No. 11) will be denied; Defendant's Motion for Summary Judgment (ECF No. 13) will be granted; and the decision of the ALJ will be affirmed.

An appropriate Order follows.

June 6, 2014

s/ Arthur J. Schwab  
Arthur J. Schwab  
United States District Judge

cc: All Registered ECF Counsel and Parties